# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

No. 24-3009

CITY OF SPRINGFIELD, OFFICE OF PUBLIC UTILITIES, doing business as City Water, Light and Power,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents,*

v.

PRAIRIE RIVERS NETWORK and SIERRA CLUB,

*Intervenors.*

Petition for Review of an Order of the
Environmental Protection Administration

---

## OPENING BRIEF OF PETITIONER
## CITY WATER, LIGHT AND POWER

---

Daniel J. Deeb
Alexander J. Garel-Frantzen
Catherine M. Masters
ARENTFOX SCHIFF LLP
233 S. Wacker Dr., Ste. 7100
Chicago, IL 60606
(312) 258-5500
dan.deeb@afslaw.com
alex.garel-frantzen@afslaw.com
catherine.masters@afslaw.com
*Counsel for City Water, Light and Power*

# SUMMARY OF THE CASE & ORAL ARGUMENT REQUESTED

The City of Springfield, Office of Public Utilities d/b/a City Water, Light and Power ("CWLP") seeks review of the Pretreatment Standard for Existing Sources ("PSES") for Flue Gas Desulfurization ("FGD") wastewater set by the U.S. Environmental Protection Agency ("EPA") in its final rule, Supplemental Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category, 89 Fed. Reg. 40198 (May 9, 2024) (the "Rule"), App. _____; Add.0001-109. The Rule establishes a PSES that bans any discharges of FGD wastewater to Publicly Owned Treatment Works ("POTWs") after May 9, 2027 and is known to apply only to CWLP. The PSES must be vacated. EPA acted arbitrarily and capriciously by (1) ignoring its own regulatory definition of "pass through," (2) impermissibly imposing a stricter pretreatment standard for FGD wastewater on existing sources than on new sources, and (3) ignoring both the unique financing and procurement issues faced by CWLP and modern post-Covid supply chain changes that renders compliance with the PSES in three years impossible. CWLP requests 10 minutes for oral argument. The nine petitions for review raise complex, diverse issues.

i

# TABLE OF CONTENTS

Page

SUMMARY OF THE CASE & ORAL ARGUMENT REQUESTED ............................................................................. i

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES ............................................................. iii

GLOSSARY ................................................................................ 1

STATEMENT OF JURISDICTION ..................................................... 3

STATEMENT OF ISSUES .............................................................. 4

STATEMENT OF THE CASE ........................................................... 6

    A.       Rulemaking Background ..................................................... 6

    B.       CWLP Background ............................................................ 8

SUMMARY OF THE ARGUMENT .................................................... 10

STANDARD OF REVIEW ............................................................. 11

ARGUMENT .............................................................................. 12

I.     EPA acted arbitrarily and capriciously by failing to follow its own regulation concerning "pass through." .................. 12

II.    EPA arbitrarily and capriciously imposed a more stringent standard for existing dischargers than for new dischargers. ..................................................................... 18

III.   EPA acted arbitrarily and capriciously by concluding that compliance with the PSES for FGD wastewater within three years is feasible. ............................................. 20

CONCLUSION ........................................................................... 24

CERTIFICATE OF COMPLIANCE ................................................... 26

CERTIFICATE OF SERVICE .......................................................... 27

Appellate Case: 24-3009    Page: 4    Date Filed: 11/07/2024 Entry ID: 5454600

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Paper Inst. v. Train*, 543 F.2d 328 (D.C. Cir. 1976) .................... 5, 19

*Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794 (9th Cir. 1980) ............ 5, 21

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262 (2019) ........................................................................... 17

*Env't Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) ........................... 18

*Env't Def., Inc. v. EPA*, 509 F.3d 553 (D.C. Cir. 2007) ........................... 14

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) ........................................ 17

*Ill. Pub. Telecomm. Ass'n v. FCC*, 117 F.3d 555 (D.C. Cir. 1997) ...... 5, 20

*Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of Interior*, 95 F.4th 573 (8th Cir. Mar. 2024) ................................................................. 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............................................................................ 5, 12, 20

*Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) ............................................................................... 4, 13

*Norfolk S. Ry. Co. v. Surface Transp. Bd.*, 72 F.4th 297 (D.C. Cir. 2023) ....................................................................................... 4, 14

*Pulsifer v. United States*, 144 S. Ct. 718 (2024) .................................... 17

*Reynolds Metals Co. v. EPA*, 760 F.2d 549 (4th Cir. 1985) ..................... 5

*Suncor Energy (U.S.A.), Inc. v. EPA*, 50 F.4th 1339 (10th Cir. 2002) 4, 14

*Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923 (5th Cir. 1998) ............... 5, 21

**Statutes**

5 U.S.C. § 706(2)(A) .......................................................... 4, 5, 11

33 U.S.C. § 1317(b)(1) ............................................................ 4, 12

33 U.S.C. § 1369(b)(1) ................................................................. 3

33 U.S.C. § 1369(b)(1)(E) ............................................................ 3

**Regulations**

40 C.F.R. § 23.2 ......................................................................... 3

40 C.F.R. § 403.3 ..................................................................... 13

Appellate Case: 24-3009     Page: 5     Date Filed: 11/07/2024 Entry ID: 5454600

40 C.F.R. § 403.3(p) ............................................................. 4, 13

40 C.F.R. § 423.15(b)(13) .......................................................20

40 C.F.R. § 423.16(e)(3) ...................................................... 20, 21

## Federal Register

EPA, *Effluent Limitation Guidelines and Standards for the Steam Electric Power Generating Point Source Category*, 80 Fed. Reg. 67838 (Nov. 3, 2015) ........................................................................6

EPA, *Postponement of Certain Compliance Dates for the Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category*, 82 Fed. Reg. 43494 (Sept. 18, 2017)............................................................................................6

EPA, *Steam Electric Reconsideration Rule*, 85 Fed. Reg. 64650 (Oct. 13, 2020).............................................................................................6

EPA, *Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category*, 86 Fed. Reg. 41801 (Aug. 3, 2021) .......................................................................7

EPA, *Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category*, 88 Fed. Reg. 18824 (Mar. 29, 2023)...............................................................................7

EPA, *Supplemental Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category*, 89 Fed. Reg. 40198 (May 9, 2024) ............................. i, 3, 8, 9, 12, 15, 16, 19, 21

## Other Authorities

*A Legislative History of the Water Pollution Control Act Amendments of 1972* (92d Cong. Dec. 7, 1972) .............................................19

*Sw. Elec. Power Co. v. EPA*, No. 24-2123, ECF No. 5426258 (filed Aug. 20, 2024) ..............................................................................23

Appellate Case: 24-3009    Page: 6    Date Filed: 11/07/2024 Entry ID: 5454600

# GLOSSARY

| Abbreviation/Term | Definition |
| --- | --- |
| Add. | Addendum |
| BAT | Best Available Technology Economically Achievable |
| BADCT | Best Available Demonstrated Control Technology |
| CWA | Clean Water Act |
| CWLP or Petitioner | City of Springfield, Office of Public Utilities d/b/a City Water, Light and Power |
| Dallman | CWLP's V.Y. Dallman Power Station |
| District | Sangamon County Water Reclamation District |
| EPA | U.S. Environmental Protection Agency |
| ERG Memo | Memo fr. Elizabeth Gentile, ERG, to Steam Electric Rulemaking Record, FGD and Bottom Ash Implementation Timing, ROA Doc. No. 15184 (Oct. 17, 2019) |
| FDPCTO Process | Funding, Design, Procurement, Construction, Testing and Operational Process |
| FGD | Flue Gas Desulfurization |
| POTW | Publicly Owned Treatment Works |
| PSES | Pretreatment Standard for Existing Sources |
| PSNS | Pretreatment Standard for New Sources |
| ZLD | Zero Liquid Discharge |

1

| Abbreviation/Term | Definition |
|---|---|
| Rule | EPA, *Supplemental Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category,* 89 Fed. Reg. 40198 (May 9, 2024) |

# STATEMENT OF JURISDICTION

EPA promulgated the Rule, including the PSES for FGD wastewater challenged by CWLP, pursuant to several sections of the Clean Water Act ("CWA"): 33 U.S.C. §§ 1311, 1314, 1316, 1317, 1318, 1342, and 1361. The Rule was published on May 9, 2024. *See* 89 Fed. Reg. 40198-306, App. _____; Add.0001-109.

This Court has jurisdiction to hear this Petition under CWA § 509(b)(1)(E), 33 U.S.C. § 1369(b)(1)(E), which provides that review of EPA's actions "in approving or promulgating any effluent limitation or other limitation" under 33 U.S.C. §§ 1311, 1312, 1316, or 1345 may be had by any interested person in the United States Circuit Court of Appeals in which the person resides or transacts business that is directly affected by such action. On September 18, 2024, CWLP timely filed this Petition in the U.S. Court of Appeals for the Seventh Circuit because it owns and operates a coal-fired unit at the V.Y. Dallman Power Station, located in Springfield, Illinois, within the Seventh Circuit. *See* 33 U.S.C. § 1369(b)(1); 40 C.F.R. § 23.2. On October 1, 2024, the Petition was transferred to this Court (where the JPML had

Appellate Case: 24-3009     Page: 9     Date Filed: 11/07/2024 Entry ID: 5454600

consolidated eight other appeals challenging different provisions of the Rule) upon EPA's motion. Order, Case No. 24-2626, Doc. No. 5.

## STATEMENT OF ISSUES

1. The CWA allows EPA to set a PSES for pollutants determined to "pass through" a Publicly Owned Treatment Works ("POTW"). But in setting the Rule's PSES for FGD wastewater, EPA ignored its own regulatory definition of "pass through," assumed that FGD wastewater nonetheless "passes through" the POTW, and set a PSES that bars CWLP from discharging any FGD wastewater to its POTW. Did EPA act arbitrarily and capriciously by conducting the Rule's "pass through" determination without regard to its regulatory definition of the term and establishing this zero-discharge PSES?

  5 U.S.C. § 706(2)(A)

  33 U.S.C. § 1317(b)(1)

  40 C.F.R. § 403.3(p)

  *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014)

  *Norfolk S. Ry. Co. v. Surface Transp. Bd.*, 72 F.4th 297 (D.C. Cir. 2023).

  *Suncor Energy (U.S.A.), Inc. v. EPA*, 50 F.4th 1339 (10th Cir. 2002)

4

2.    The CWA requires pretreatment standards for new sources to be more stringent than those for existing sources. Did EPA act arbitrarily and capriciously by imposing on existing sources a PSES for FGD wastewater that is more stringent than the standard for new sources?

5 U.S.C. § 706(2)(A)

*Reynolds Metals Co. v. EPA*, 760 F.2d 549 (4th Cir. 1985)

*Am. Paper Inst. v. Train*, 543 F.2d 328 (D.C. Cir. 1976)

3.    Did EPA act arbitrarily and capriciously by relying on an inaccurate estimate from an unnamed vendor to reach the conclusion that it is somehow possible for a public utility like CWLP to comply with the PSES for FGD wastewater within three years?

5 U.S.C. § 706(2)(A)

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)

*Ill. Pub. Telecomm. Ass'n v. FCC*, 117 F.3d 555 (D.C. Cir. 1997), *decision clarified on reh'g*, 123 F.3d 693.

*Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923 (5th Cir. 1998)

*Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794 (9th Cir. 1980)

Appellate Case: 24-3009    Page: 11    Date Filed: 11/07/2024 Entry ID: 5454600

## STATEMENT OF THE CASE

### A.    Rulemaking Background

The Rule represents EPA's third PSES for FGD wastewater in less than a decade. Under the Obama Administration, EPA issued a PSES for FGD wastewater, which, as applied to CWLP, required power plants to use chemical precipitation followed by biological treatment technology, and established effluent limitations for mercury, arsenic, selenium, and nitrate/nitrite. 80 Fed. Reg. 67838 at 67860-61 (Nov. 3, 2015) (the "2015 Rule"), App. _____.

Under the Trump Administration, EPA announced that it would reconsider the 2015 Rule and postponed its compliance dates for FGD wastewater until completion of that further rulemaking. 82 Fed. Reg. 43494 (Sept. 18, 2017), App. _____. That further rulemaking concluded with EPA's promulgation of the 2020 Rule, which required installation of chemical precipitation followed by a low hydraulic residence time biological reduction treatment technology and established a PSES for FGD wastewater entailing stringent effluent limits that were to be met within three years, by October 13, 2023. 85 Fed. Reg. 64650 at 64660, App. _____.

Without staying the PSES requirements of the 2020 Rule, the

6

Biden Administration announced that it would engage in an additional rulemaking to strengthen certain requirements of the 2020 Rule. 86 Fed. Reg. 41801 (Aug. 3, 2021), App. _____. EPA issued a proposed rule on March 29, 2023, 88 Fed. Reg. 18824, App. _____, and promulgated the Rule on May 9, 2024.

The Rule governs certain discharges from coal- and gas-fired electric power plants, including from indirect dischargers, *i.e.*, power plants that discharge to POTWs, which ultimately discharge to a navigable waterbody. For existing indirect dischargers, the Rule establishes "pretreatment standards" for certain discharges if they are determined to "pass through" or "interfere" with a POTW. Those pretreatment standards include EPA determinations of the technologies that must be installed and used by indirect dischargers to achieve such standards. Pretreatment standards that apply to existing facilities are called Pretreatment Standards for Existing Sources ("PSES") and those that apply to new facilities are called Pretreatment Standards for New Sources ("PSNS").

The Rule establishes a PSES that completely bans any discharges

7

of FGD wastewater to POTWs after May 9, 2027.[1] EPA sometimes calls this ban a "zero liquid discharge" limitation or "ZLD." *See, e.g.*, Rule at 40255, App. \_\_\_\_\_; Add.0058. This Petition concerns only the Rule's zero-discharge PSES for FGD wastewater discharges to a POTW.

## B. CWLP Background

CWLP is a small municipal utility owned by the City of Springfield, Illinois.[2] Its Dallman Station provides electric power to approximately 68,000 customers. CWLP Public Comment at p. 1; Add.0110. Until recently, Dallman included four coal-combustion units that generated electricity. Three of those units (Units 31, 32 and 33) were retired following EPA's issuance of the 2020 Rule to meet that rule's requirements for dry ash handling of fly ash and bottom ash waste streams. *Id.* The remaining unit, Dallman Unit 4, is one of the newest coal-fired units in the nation. *Id.* It was constructed to include state-of-the-art equipment including a dry ash handling system, closed-

_____

[1] The Rule also bans direct discharges of FGD wastewater but sets an outside compliance date of December 31, 2029, more than 2.5 years longer than the May 9, 2027, deadline for indirect dischargers. Rule at 40295 and 40300, App. \_\_\_\_\_; Add.0098 and Add.0103.

[2] *See* Public Comment submitted by CWLP, at p. 1 (May 30, 2023), App. \_\_\_\_\_; Add.0110 ("CWLP Public Comment").

cycle cooling, low NOx burners, selective catalytic reduction, hydrated lime injection, baghouse, wet FGD, and a wet electrostatic precipitator. *Id.*

Dallman Unit 4 generates FGD wastewater, *id.*, and is the only source in the country known to be subject to the PSES for FGD wastewater.[3] The FGD waste stream flows to an on-site pretreatment plant where it receives extensive physical/chemical pretreatment. *Id.* The pretreatment system was designed, installed, and operated at substantial cost to CWLP. CWLP Public Comment at p. 2; Add.0111.

After being pretreated to meet the PSES of the 2020 Rule, Dallman's (pretreated) FGD wastewater flows via a dedicated force main to the POTW operated by the Sangamon County Water Reclamation District (the "District"). *Id.* at p. 1. The District's POTW further treats those flows, plus flows from other dischargers, prior to discharging to Spring Creek pursuant to a Clean Water Act ("CWA") permit issued by the Illinois Environmental Protection Agency (the

---

[3] EPA has acknowledged that CWLP is the sole indirect discharger of FGD wastewater and is thus the only facility subject to the discharge ban for FGD wastewater. *See* Rule at 40257, App. _____, Add.0060; EPA, Response to Public Comments for the Rule, at p. 1185 (April 2024), App. _____; Add.0116.

9

"District NPDES Permit"). *Id.*

CWLP has been discharging pretreated FGD wastewater from Dallman to the District's POTW, where it is further treated, since November 2009. *See id.* No record evidence indicates that these longstanding discharges have caused any harm to the District's receiving water, Spring Creek.

CWLP filed this Petition on September 18, 2024. On October 21, 2024, CWLP filed a motion to stay the PSES for FGD wastewater pending judicial review, which is currently pending before the Court.

## SUMMARY OF THE ARGUMENT

For three independent reasons, EPA acted arbitrarily and capriciously in setting the zero-discharge PSES for FGD wastewater.

First, EPA failed to apply its own regulatory definition of "pass through" in performing the threshold determination required before the Agency is authorized to establish a PSES for a pollutant. Under EPA's own regulatory definition, the administrative record fails to demonstrate any "pass through" of FGD wastewater.

Second, EPA impermissibly imposed a more stringent standard for existing dischargers of FGD wastewater than for new dischargers of

10

this waste stream. The CWA requires, and EPA acknowledges in the Rule, that the standards for new sources (not existing sources) are to be the strictest.

Third, in establishing a 36-month compliance period for the PSES under review, the Agency ignored the unique and critical issues faced by public utilities like CWLP to raise needed capital, plan and design systems, procure equipment, and construct, test, and operate additional equipment. This extensive and unavoidable process, which CWLP and others raised to EPA through public comments, makes compliance within 36 months impossible. EPA's compliance period determination also failed to take into account post-pandemic supply chain delays, which may independently preclude compliance within three years.

Therefore, the Rule's PSES for FGD wastewater must be reversed or vacated and remanded to EPA for further proceedings.

## STANDARD OF REVIEW

A reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the

11

problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency must "engage in 'reasoned decisionmaking'" through a "process by which [the agency] reaches [a] result [that is] logical and rational.'" *Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of Interior*, 95 F.4th 573, 579-80 (8th Cir. Mar. 2024).

## ARGUMENT

## I. EPA acted arbitrarily and capriciously by failing to follow its own regulation concerning "pass through."

The CWA authorizes EPA to establish pretreatment standards (*i.e.*, a PSES and PSNS) "to prevent the discharge of any pollutant through [POTWs] . . . which pollutant interferes with, *passes through*, or otherwise is incompatible with such [POTWs]." 33 U.S.C. § 1317(b)(1) (emphasis added). In other words, to establish a PSES for a pollutant, EPA must first determine that the pollutant "interferes" with, "passes through," or "is otherwise incompatible with" a POTW. The Rule's PSES for FGD wastewater presents only a "pass through" determination. Rule at 40255, App. _____; Add.0058.

12

While the CWA does not define "pass through," EPA has issued a regulation interpreting the statutory term to mean:

> [A] Discharge which exits the POTW into waters of the United States in quantities or concentrations which, alone or in conjunction with a discharge or discharges from other sources, is a cause of a violation of any requirement of the POTW's NPDES permit (including an increase in the magnitude or duration of a violation).

40 C.F.R. § 403.3(p). Through this regulatory definition, EPA makes clear that a "pass through" occurs when a discharge from a facility to a POTW contributes to a violation of the POTW's permit. In the Rule, however, EPA ignores and fails to apply its own regulatory definition—by banning any discharge to a POTW, even if the POTW is in complete compliance with its EPA permit. In doing so, EPA acted arbitrarily and capriciously.

An agency is bound to follow its own rules. It is arbitrary and capricious if the agency fails to do so. *See, e.g.*, *Nat'l Env't Dev. Assoc.'s Clean Air Project* ["*NEDACAP*"] *v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("[A]n agency is bound by its own regulations. . . . [An] agency is not free to ignore or violate its regulations while they remain in effect. Thus, an agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'"). In *NEDACAP*,

13

for example, the court set aside an EPA policy directive because it was "plainly contrary to EPA's own regulations" under the Clean Air Act ("CAA"). *Id.* at 1003.

Similarly, the agency acts arbitrarily and capriciously if its interpretation "would contravene the plain text of [EPA's] own regulations." *Norfolk S. Ry. Co. v. Surface Transp. Bd.*, 72 F.4th 297, 306–07 (D.C. Cir. 2023). In *Env't Def., Inc. v. EPA*, 509 F.3d 553, 561 (D.C. Cir. 2007), the D.C. Circuit held that EPA acted arbitrarily and capriciously by interpreting the phrase "any area" differently than in the same subsection of a CAA regulation. *See also Suncor Energy (U.S.A.), Inc. v. EPA*, 50 F.4th 1339, 1355 (10th Cir. 2002) (holding that EPA's interpretation of the statutory and regulatory term "refinery," made in determining that operator's two adjacent oil refining facilities did not each qualify as a small refinery under the CAA's Renewable Fuel Standard Program, was not reasonable, where EPA "appear[ed] to have ignored a relevant regulatory definition—*i.e.*, its own regulatory definition of the term 'facility'—in reaching its decision in this case," when that regulatory definition may have allowed EPA to resolve the petitioners' requests without having to engage in further interpretation

14

of the term "refinery").

At least two things make clear that EPA ignored its regulatory definition of "pass through" in issuing the Rule. One, the Rule's administrative record contains no discussion or analysis of any POTW effluent violations.[4] Two, the pass-through discussion in the Rule's preamble makes no mention or use of EPA's regulatory definition. Instead, the Rule's preamble states two entirely different interpretations of "pass through." First, the Rule explains "pass through" as follows:

> A pollutant is determined to pass through POTWs when the median percentage removed nationwide by well-operated POTWs is less than the median percentage removed by the BAT/NSPS[5] technology basis. The EPA establishes pretreatment standards for those pollutants regulated under BAT/NSPS that pass through POTWs.

Rule at 40255, App. _____; Add.0058. Second, the Rule explains that, in the context of zero-discharge limitations, a pass-through determination simply and uniformly assumes that all pollutants would pass through a

---

[4] The Rule's pass-through determination improperly assumed that pollutants would pass through the District's POTW, without assessing and considering the degree of treatment provided by that POTW, the only POTW in the country that receives FGD wastewater discharges.

[5] NSPS means "New Source Performance Standards."

Appellate Case: 24-3009    Page: 21    Date Filed: 11/07/2024 Entry ID: 5454600

POTW but for the application of the technology required of direct

dischargers:

> EPA did not conduct its traditional pass-through analysis for wastestreams with zero-discharge limitations or standards. Zero-discharge limitations and standards achieve 100 percent removal of pollutants, including salts like boron and bromide which are not treated at all by the typical POTW treatment system. Therefore, the EPA concludes that all pollutants in those wastestreams treated by the zero discharge technologies would otherwise pass through the POTW absent application of the zero discharge technologies that form the BAT bases for FGD wastewater, BA transport water, and CRL.

*Id.*, App. _____; Add.0058 (internal footnote omitted). In other words, in

the ZLD context, the Rule interprets "pass through" by assuming that

all pollutants fully pass through POTWs without any treatment by the

POTWs, regardless of the actual degree of treatment accomplished by

the POTWs. Neither of the Rule's interpretations of "pass through"

exists in the CWA or any regulation.

EPA may attempt to oppose this Petition by arguing that its

competing interpretations of "pass through" are to be applied in

different contexts. Such a contention would fail for two reasons. First,

the competing interpretations of the statutory term are not equal in

weight, because only one interpretation exists as a regulation, and as

explained above, the agency is simply not free to disregard its regulations.

Second, nothing in the CWA or its legislative history supports the notion that "pass through" is to have multiple meanings. Assigning multiple meanings to the same statutory term would, in fact, be contrary to a recent Supreme Court decision regarding the canon of consistent use—*i.e.*, the principle that a single statutory term (*e.g.*, "pass through") should ordinarily not have multiple interpretations. "In a given statute, the same term usually has the same meaning and different terms usually have different meanings." *Pulsifer v. United States*, 144 S. Ct. 718, 735 (2024); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) ("[I]dentical words used in different parts of the same act are intended to have the same meaning.") (citations omitted) and *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 267 (2019) ("In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning" across a statute.).

The presumption of a consistent interpretation of a statutory term can yield when "there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were

17

employed in different parts of the act with different intent." *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 562 (2007). No such variation exists here. In the context of POTWs and pretreatment, the CWA uses "pass through" or "passes through" only three times: in (1) Section 1317(b) (regarding PSES), (2) Section 1317(c) (regarding PSNS), and (3) Section 1314(g) (regarding pretreatment guidelines). In all three instances, the term is used in the identical context concerning pollutants that are not or cannot be treated by a POTW. Accordingly, there is no basis to use differing interpretations of "pass through" under the CWA, and EPA acted arbitrarily and capriciously in doing so.

## II. EPA arbitrarily and capriciously imposed a more stringent standard for existing dischargers than for new dischargers.

Standards for new sources are supposed to be the strictest. That is, standards for new sources (as opposed to existing sources such as CWLP) are to be based on the Best Available Demonstrated Control Technology ("BADCT"), the CWA's most stringent technology standard. CWA legislative history is clear that the level of control for new dischargers (*i.e.*, BADCT) is to be more stringent than the level of control for existing dischargers (*i.e.*, the Best Available Technology

18

Economically Achievable, or "BAT"). *See, e.g.*, *A Legislative History of the Water Pollution Control Act Amendments of 1972,* at p. 1199 (92d Cong. Dec. 7, 1972) ("The required standard of performance for [] new sources would incorporate the greatest degree of effluent reduction which the administrator determines to be achievable."); *id.* at p. 1475 (93d Cong. Jan. 1973) ("[T]he standards of performance for new source of water pollution would require the achievement of the greatest degree of pollution reduction that can be achieved . . . .").

The Rule itself acknowledges that the BADCT for new sources is the most stringent level of control under the CWA. *See* Rule at 40202; App. _____; Add.0005 ("NSPS should represent the most stringent controls attainable through the application of the BADCT for all pollutants . . . ."). Courts further agree that BADCT represents the most stringent level of control. *See, e.g.*, *Am. Paper Inst. v. Train*, 543 F.2d 328, 334 (D.C. Cir. 1976) ("In general, the [CWA] envisions . . . the new source performance standards as the most stringent.").

The Rule, however, improperly sets a PSES for FGD wastewater that is far more stringent than the PSNS for FGD wastewater. In particular, the Rule's PSES for FGD wastewater completely bans all

19

discharges of all pollutants while the PSNS for FGD wastewater sets
non-zero effluent limitations for arsenic, mercury, selenium, and total
dissolved solids. *Compare* 40 C.F.R. § 423.16(e)(3), *with* 40 C.F.R.
§ 423.15(b)(13). In other words, the Rule improperly sets the PSES for
FGD wastewater to be more stringent than the NSPS for FGD
wastewater, nonsensically allowing new sources to discharge FGD
wastewater while existing sources may not. Such a result is counter to
legislative intent and is arbitrary and capricious.

## III. EPA acted arbitrarily and capriciously by concluding that compliance with the PSES for FGD wastewater within three years is feasible.

A court must set aside agency action if the agency "entirely failed
to consider an important aspect of the problem, offered an explanation
for its decision that runs counter to the evidence before the agency, or is
so implausible that it could not be ascribed to a difference in view or the
product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.
State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ill. Pub.
Telecomm. Ass'n v. FCC*, 117 F.3d 555, 566 (D.C. Cir. 1997), *decision
clarified on reh'g*, 123 F.3d 693 (unexplained and "seemingly illogical"
decisions are arbitrary and capricious). Moreover, "[a] regulation cannot

20

stand if it is based on a flawed, inaccurate, or misapplied study." *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 935 (5th Cir. 1998); *see also Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 819-20 (9th Cir. 1980) (remanding CWA regulation to EPA where agency relied on study and failed to articulate the reasons for its determination).

The Rule requires CWLP to meet the zero-discharge PSES for FGD wastewater within 36 months, by May 9, 2027. Rule at 40300, App. _____; Add.0103 (codified at 40 C.F.R. § 423.16(e)(3)).[6] In determining that the 36-month compliance period was achievable, EPA ignored the unique and critical issues faced by public utilities to raise needed capital, plan and design systems, procure equipment, and construct, test, and operate additional equipment (the "Funding, Design, Procurement, Construction, Testing and Operational Process"

_____

[6] The CWA provides that regulations issued by EPA to establish pretreatment standards must specify a compliance period not to exceed three years. 33 U.S.C. § 1317(b)(1). With this in mind, CWLP is not contending that the Rule could or should have allowed more time for compliance with the PSES for FGD wastewater. Rather, CWLP maintains that (a) EPA cannot properly establish a PSES that cannot be fully implemented by indirect dischargers within three years and (b) if ordered on remand to include processes applicable to Dallman (as a public utility) under post-pandemic supply chain realities, EPA will find on reconsideration that the Rule's PSES for FGD wastewater cannot actually be implemented within three years.

Appellate Case: 24-3009     Page: 27     Date Filed: 11/07/2024 Entry ID: 5454600

or "FDPCTO Process"). As stated in the public comment of the American Public Power Association, which CWLP supported in its public comments:

> Public power utilities as entities of state and local government are governed by city councils and elected or appointed boards. Customers have a direct input in utility decisions . . . . Public power utilities use municipal bonds to finance investments in power generation transmission, distribution, reliability, demand control, efficiency, wastewater, and emission control projects. Municipal bonds . . . have maturities nearly twice as long as corporate bonds and are generally issued as a series with varying maturities, rather than a single maturity. A public power utility is limited in how they raise capital. . . . [P]ublic power utilities will have to undergo varying steps to obtain approval to retrofit BA transport water and FGD wastewater technologies. The utilities' governing bodies must meet to determine if the project is necessary and review and approve staff plans to implement the option(s) selected. The city councils or boards must meet to pass a resolution to finance the project, and then a bond counsel is assembled. The bond process could take six months to one year, followed by an additional year to decide on the bond product. Then there is a three- to six-month process to raise electricity rates to recover the capital costs.

Ltr. from Carolyn Slaughter, Am. Public Power Assoc., to Andrew Wheeler, EPA, pp. 42-43 (Jan. 21, 2020), App. _____; Add.0118-19. EPA has not rebutted this record evidence.

    In a prior pleading to this Court, EPA stated that the "actual time needed to comply with ZLD limits [is] 28 months for FGD wastewater."

22

Respondents' Opposition to Utility and State Petitioners' Motion for a Stay Pending Review, *Sw. Elec. Power Co. v. EPA*, No. 24-2123 (8th Cir.), History No. 5426258 at p. 22 (filed Aug. 20, 2024). That agency estimate of the "actual time needed to comply" is predicated on a 2019 ERG memo that uses an estimate based on information "collected from one vendor." Memo fr. Elizabeth Gentile, ERG, to Steam Electric Rulemaking Record, FGD and Bottom Ash Implementation Timing, at p. 3 (Oct. 17, 2019), App. _____; Add.0120 at Add.0122 ("ERG Memo"). The ERG Memo includes the following Figure 2 labeled "Typical Timeline for Installing Membrane Filtration."



*Id.* Nowhere does the ERG Memo give any indication that the unnamed vendor considered the circumstances of Dallman (the only power plant to which this PSES applies), or that it factored in any of the additional

construction timeline hurdles experienced in the post-pandemic world[7] or those necessarily borne by a municipality.

In sum, EPA failed to consider the important aspects of the FDPCTO Process applicable to a municipal utility like CWLP and relied upon an inaccurate and flawed estimate. In doing so, EPA acted arbitrarily and capriciously.

## CONCLUSION

CWLP respectfully requests that the Court grant this Petition for Review and reverse or vacate and remand the PSES for FGD wastewater under review to EPA for further proceedings.

---

[7] *E.g.*, EPA, Response to Public Comments for the Rule, at p. 348, App. _____, Add.0113 ("Procurement and installation of new systems at power plants have been hampered recently by supply chain problems, despite the official end of the pandemic.") (comment from Utility Water Act Group); *id.* at p. 885, App. _____, Add.0115 ("[E]lectric utilities are facing significant challenges and delays in their supply chains . . . .") (comment of National Rural Electric Cooperative Association). EPA did not respond to these public comments.

Appellate Case: 24-3009    Page: 30    Date Filed: 11/07/2024 Entry ID: 5454600

Dated: November 7, 2024      Respectfully submitted,

<u>/s/ Daniel J. Deeb</u>
Daniel J. Deeb
Alexander J. Garel-Frantzen
Catherine M. Masters
ARENTFOX SCHIFF LLP
233 S. Wacker Dr. Ste. 7100
Chicago, IL 60606
(312) 258-5500
dan.deeb@afslaw.com
alex.garel-frantzen@afslaw.com
catherine.masters@afslaw.com
*Counsel for City Water, Light and Power*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Opening Brief of Petitioner CWLP complies with the type-volume limitation of 4,500 words set forth in the Court Order dated October 29, 2024 because the Brief contains 4,488 words, excluding the parts exempted by Fed. R. App. P. 32(f). This Brief also complies with the typeface and the type style requirements of Federal Rule of Appellate Procedure 32(a)(5) because it has been prepared in a proportionally spaced typeface using Word 14-point Century Schoolbook typeface.

I further certify that the PDF file was scanned for viruses and found to be virus-free.

Dated: November 7, 2024        */s/ Daniel J. Deeb*
                                      Daniel J. Deeb

Appellate Case: 24-3009    Page: 32    Date Filed: 11/07/2024 Entry ID: 5454600

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of November 2024, the foregoing Opening Brief of Petitioner CWLP was electronically filed with the Clerk of Court for the U.S. Court of Appeals for the Eighth Circuit by using the CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Alexander J. Garel-Frantzen*
Alexander J. Garel-Frantzen

AFSDOCS:300593974.7

27